OPINION
{¶ 1} Laqwan Scandrick was convicted after a jury trial in the Clark County Court of Common Pleas of two counts of aggravated burglary (Case No. 06-CR-355), one count of attempted burglary (Case No. 06-CR-701), and one count of intimidation of a witness (Case No. *Page 2 
2 06-CR-701). For all of these convictions, the court sentenced him to an aggregate term of thirty years in prison. Scandrick appeals from his convictions, raising two assignments of error. The first assignment of error relates to his convictions in Case No. 06-CR-355, and the second assignment of error concerns his conviction for intimidation of a witness in Case No. 06-CR-701. For the following reasons, his convictions will be affirmed.
 {¶ 2} The state's evidence at trial established the following facts.
 {¶ 3} During the morning of March 16, 2006, Brooke Cosby ("Brooke") met Scandrick for what became the first of several confrontations that day. According to Brooke, she drove to Scandrick's apartment on High Street in Springfield in her grandmother's Mercury Sable, and she sat with Scandrick in the car while he spoke on the phone with his baby's mother for approximately twenty minutes. When his conversation ended, Scandrick was visibly upset.
 {¶ 4} At Scandrick's request, Brooke drove him to McDonald's but he decided that he did not want to order anything. Brooke then drove him back toward his apartment. Scandrick instructed Brooke to pull over in front of Conway's Funeral Home so he could walk the rest of the way. When Brooke pulled over, Scandrick began yelling at Brooke that she was "stupid" and "going to get him locked up" and that she "wasn't going to drop the first charge that [she] had filed against him." Brooke testified that she had filed a domestic violence charge against Scandrick on March 5, 2006.
 {¶ 5} Scandrick hit Brooke in the face, and he asked her to pull into the church parking lot next to his apartment. Once in the parking lot, the fight escalated. Scandrick again hit Brooke, and he told her to drive around. During the ten to fifteen minute drive, Scandrick continued to hit Brooke, scream at her, pull her hair, and curse at her. They then returned to *Page 3 
High Street. Scandrick told Brooke to get out of the car, and he told her that she "better kiss [her] mother and [her] daughter good-bye because [she was] not going to see them ever again." Brooke stayed in the car while Scandrick got out. Although he ordered Brooke not to leave, she locked the doors and drove away as soon as Scandrick closed the car door.
 {¶ 6} Brooke drove to her mother's home at 1114 South Fountain Avenue, arriving at approximately 2:00 p.m. Brooke was upset, crying, and had scrapes and bruises on her face. Gail Perry, Brooke's mother, called the police.
 {¶ 7} At approximately 4:00 p.m. on the same day, Scandrick came to Perry's home with his sister, LaToya Scandrick, and another woman, Shannel Terry. When Scandrick arrived, Perry was in her car. Scandrick asked her, "Where is she at?" Perry responded, "Let things blow over. Everybody's upset." Scandrick replied that if he "didn't see Brooke today, no one would see her tomorrow." Perry told Scandrick that she would call the police if he went onto the porch. Scandrick went to the front door and kicked it open. He went into the house and punched Brooke in the face with his fist. LaToya and Terry followed him in. Perry ran into the house after them and called the police. Scandrick and the two women left.
 {¶ 8} Brooke stayed at her mother's home until approximately 8:00 p.m. and then went to her grandparents' home at 1825 Wittenberg Boulevard, where she lived with her grandparents and daughter. She left the Mercury Sable at the Fountain Avenue residence.
 {¶ 9} Between 9:00 p.m. and 10:00 p.m. that evening, Brooke heard a boom. At first she thought it was her grandfather falling, but he said that he was watching television. Brooke continued to hear a loud continuous boom, and she looked tried to look outside from the front door peep hole and the window in her bedroom. When she heard the front door crack, she *Page 4 
grabbed her cell phone, the house phone, and her daughter, and she ran to the bathroom to call 911. From inside the bathroom, Brooke heard the front door burst open. Jesse Cosby ("Cosby"), Brooke's grandfather, asked Scandrick what he was doing there. Scandrick checked the bedrooms for Brooke, saying, "Where's she at? Where is she at? I'm going to kill her. I'm going to kill her. Where's she at?" Cosby repeatedly told Scandrick that Brooke had left the house and that she was not there. Scandrick did not check the bathroom, and he did not find Brooke. Scandrick left.
 {¶ 10} Soon thereafter, Scandrick returned to the Fountain Avenue residence. Perry heard a car window break, and she saw Scandrick walking toward the porch with a stick or log in his hand. Perry then heard the glass in her front door being broken. Perry called her husband, who had gone to her father's home on Wittenberg and told him that Scandrick was there. Perry then called the police. Scandrick did not enter the residence.
 {¶ 11} Scandrick was subsequently charged with two counts of aggravated burglary, one count of attempted burglary, and one count of intimidation of a witness. (Case No. 06-CR-355). On June 26, 2006, Scandrick was reindicted for attempted burglary and intimidation of witness. (Case No. 06-CR-701). The attempted burglary and intimidation charges in Case No. 06-CR-355 were dismissed on July 14, 2006. On the same date, the two cases were consolidated for trial.
 {¶ 12} On September 28, 2006, Scandrick filed a motion to dismiss the aggravated burglary charges on the ground that the state had failed to specify the underlying offense. The trial court overruled the motion on September 29, 2006, and the cases proceeded to trial on October 2, 2006. After deliberations, the jury convicted Scandrick on each of the charges. The *Page 5 
court sentenced Scandrick to two ten-year terms in prison for the aggravated burglaries, to be served consecutively to each other and to the sentence imposed in Case No. 06-CR-701. The court sentenced Scandrick to two five-year terms in prison for attempted burglary and for intimidation, to be served consecutively to each other and to the sentence imposed in Case No. 06-CR-355.
 {¶ 13} "I. "THE TRIAL COURT ERRED IN FAILING TO DISMISS THE INDICTMENT REGARDING THE COUNTS OF AGGRAVATED BURGLARY AS BOTH THE INDICTMENT AND THE BILL OF PARTICULARS FAILED TO SPECIFY THE UNDERLYING CRIMINAL OFFENSE UPON WHICH THE CHARGE WAS BASED."
 {¶ 14} In his first assignment of error, Scandrick claims that the indictment in Case No. 06-CR-355 was fatally defective, because neither the indictment nor the state's bill of particulars specified the name, code section, or nature of the underlying offense for his aggravated burglary charges. Scandrick's argument is without merit.
 {¶ 15} Crim.R. 7(E) provides that "[w]hen the defendant makes a written request within twenty-one days after arraignment but not later than seven days before trial, or upon court order, the prosecuting attorney shall furnish the defendant with a bill of particulars setting up specifically the nature of the offense charged and of the conduct of the defendant alleged to constitute the offense. A bill of particulars may be amended at any time subject to such conditions as justice requires."
 {¶ 16} "The purposes of an indictment are to give an accused adequate notice of the charge, and enable an accused to protect himself or herself from any future prosecutions for the same incident." State v.Buehner, 110 Ohio St.3d 403, 2006-Ohio-4707, *Page 6 853 N.E.2d 1162, ¶ 7. It is well-established that "the requirements of an indictment may be met by reciting the language of the criminal statute."State v. Murphy (1992), 65 Ohio St.3d 554, 583, 605 N.E.2d 884; see, also, State v. Landrum (1990), 53 Ohio St.3d 107, 119, 559 N.E.2d 710. As acknowledged by Scandrick, the Supreme Court of Ohio has rejected the assertion that the indictment must identify the elements of the underlying offense of the charged crime. Buehner at ¶ 10. Rather, the supreme court has held that "when the indictment sufficiently tracks the wording of the statute of the charged offense, the omission of an underlying offense in the indictment can be remedied by identifying the underlying offense in the bill of particulars." Id., citing State v.Skatzes, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 30.
 {¶ 17} Here, the indictment against Scandrick charged two counts of aggravated burglary, both of which tracked the language of R.C.2911.11(A)(1). Accordingly, Scandrick's indictment was not defective on its face for failure to specify the underlying offense.
 {¶ 18} Citing Buehner, Scandrick claims that the state was required to specify the underlying offense in the bill of particulars. At the outset, we note that it is undisputed that Scandrick asked for and received a bill of particulars from the state. However, the record does not contain either the request for the bill of particulars nor the bill of particulars itself. The first mention of a bill of particulars appeared in Scandrick's motion to dismiss, which asserted that the indictment was defective on its face for failing to delineate the underlying offense and that the bill of particulars also failed to specify the offense.
 {¶ 19} We recently addressed Scandrick's argument in State v.Morris, Clark *Page 7 
App. No. 06-CA-65, 2007-Ohio-3591. In that case, Morris likewise argued that his conviction for aggravated burglary violated his right to due process because the state had failed to identify the underlying offense in either the indictment or the bill of particulars. We overruled the assignment of error, first noting that because the record did not include Morris's request pursuant to Crim.R. 7(E), "we [had] no basis from which to determine if the state sufficiently responded with the requested information." Id. at ¶ 26. We further addressed the trial court's position that a bill of particulars is not required to identify the underlying offense. As in this case, the trial court had cited toState v. Rivers, Cuyahoga App. No. 83321, 2004-Ohio-2566, which found that a bill of particulars reciting the aggravated burglary statute verbatim and adding the date, time and location of the incident was sufficient to notify the defendant as to the offense the state intended to prove. Rivers at ¶ 22. The Rivers court stated that, to include more, i.e., the underlying crime, "would allow the defense insight into the state's theory of the case, which is clearly not the purpose of the bill of particulars * * *." Id. We concluded in Morris that the trial court did not abuse its discretion in relying upon Rivers on the morning of trial.Morris at ¶ 35. However, we stated our belief that identifying the underlying offense would not "exceed the limited scope of a bill of particulars by infringing on the state's argument or taking the place of formal discovery." Id. at ¶ 36. We stated:
 {¶ 20} "The court in Rivers, supra, relied heavily on the fact that the majority of the case law on this matter limits a bill of particulars to identifying only the date and time of the alleged crime. Additional information, the court noted, may be relevant, but it must be sought through the discovery process. This limiting interpretation fails, *Page 8 
however, to consider the cases in which a challenge as to the validity of an indictment is defeated by the presence of a bill of particulars containing such additional information as underlying offenses. In each case, the information sought was freely submitted within a valid bill of particulars and not restrained behind the confines of the formal discovery process. Properly executed, a bill of particulars should put a defendant on notice of the precise nature of his conduct giving rise to the state's case against him. In situations where statutes such as R.C.2911.11 are involved, identification of the exact time, date and place constitute only part of the information necessary to make a defendant aware of the circumstances surrounding the crimes he allegedly committed. Where a defendant makes a valid and specific request, due process requires that the particularized nature of the accused's conduct includes the behavior that demonstrates he committed an underlying offense." Id. at ¶ 37.
 {¶ 21} The state of the record in this case is similar to that inMorris. As stated above, Scandrick's request for a bill of particulars and the bill of particulars itself are absent from the record. Accordingly, we can only speculate as to what information Scandrick requested and whether the state sufficiently responded with the requested information.
 {¶ 22} Assuming, arguendo, that Scandrick made a valid request under Crim.R. 7(E) that the underlying offense be identified, Scandrick has not demonstrated that he was prejudiced by the alleged failure of the state to specify the name and code section of the underlying offense. The issue of Scandrick's motion to dismiss was raised after jury selection. At that time, Scandrick's counsel reiterated his motion to dismiss the aggravated burglary charges based on the state's failure to specify the underlying *Page 9 
offense. The trial court responded that it had filed an entry on the previous Friday which overruled the motion. However, the court stated that it "would like to hear from the prosecutor as to what the underlying offense is or if you're waiting to hear how the testimony's going to come out during the trial." The prosecutor responded that the underlying offense was assault. He stated:
 {¶ 23} "Your Honor, the allegation is that basically the — in the course of these burglaries, the underlying offense is assault. That the defendant entered these residences with the intention of locating a Brooke Cosby and the first — in Count 1-well, Count 2 actually occurred first chronologically.
 {¶ 24} "In that case he did actually break into the Perrys' home on South Fountain and did assault her. And then in Count 1, which is occurred afterward, chronologically afterward, he broke into Jesse Cosby's residence on Wittenberg Boulevard and attempted to — it was an — his intention there, we believe the testimony will show, to assault her again.
 {¶ 25} "And on that occasion, she hid in the bathroom. He didn't locate her. So that would be in both cases, both Counts 1 and 2, both aggravated burglary charges, underlying offense would be that of assault."
 {¶ 26} Based on the record, Scandrick was thus informed prior to opening arguments at trial that the underlying offense was assault and the factual basis for that underlying offense. There is no suggestion in the record that Scandrick was not prepared to defend against that underlying offense or that he was otherwise prejudiced.
 {¶ 27} The first assignment of error is overruled. *Page 10 
 {¶ 28} "II. THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION FOR ACQUITTAL UNDER CRIM. R. 29 CONCERNING THE CHARGE OF INTIMIDATING A WITNESS AS THERE WAS INSUFFICIENT EVIDENCE ON THE RECORD UPON WHICH A REASONABLE JUROR COULD HAVE FOUND APPELLANT GUILTY."
 {¶ 29} In his second assignment of error, Scandrick claims that his conviction for intimidating a witness was based on insufficient evidence.
 {¶ 30} When reviewing the sufficiency of evidence, the relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt. State v.Dennis, 79 Ohio St.3d 421, 430, 1997-Ohio-372, 683 N.E.2d 1096, citingJackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d. 560. A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id.
 {¶ 31} On appeal, Scandrick argues that the evidence does not support the conclusion that he struck Brooke in order to intimidate her as a witness or a victim. He asserts that he "never told her to drop the charges or not to testify or any such thing. To the contrary, based on Brooke Cosby's testimony, Appellant seemed resigned to the fact that `she was going to get him locked up' and that she wasn't going to drop the charge. When asked if Appellant made any threats, [Brooke] testified that he simply said to take him to his house." Scandrick thus claims that the state failed to present evidence that his conduct was motivated by an intent to intimidate or influence or hinder Brooke in her role as a victim or a witness in a criminal case. He further asserts *Page 11 
that Brooke's testimony that she filed a domestic violence charge on March 5, 2006 was insufficient to establish that a charge was pending.
 {¶ 32} Construing the evidence in favor of the state, we find sufficient evidence to support Scandrick's conviction for intimidation of a witness. Brooke testified that her argument with Scandrick first became physical after they returned from McDonald's. She stated that Scandrick "looked at me and just started yelling at me; and then he hauled off and hit me in my face." She stated that he yelled that she was "stupid" and "going to get him locked up" and "[she] wasn't going to drop the first charge that [she] had filed against him." Brooke indicated that she had filed a domestic violence charge against him on March 5, 2006. There was no evidence refuting Brooke's testimony. Although the jury could have concluded that Scandrick had a tendency to assault Brooke and was not intending to intimidate her in her role as a victim or a witness, the jury could also have reasonably concluded that Scandrick hit Brooke because she was pursing the March 5th domestic violence charge against him and wanted to dissuade her from pursuing it. The latter conclusion is supported by Scandrick's subsequent statement to Brooke that she "better kiss [her] mother and [her] daughter good-bye because [she was] not going to see them ever again." Several hours later, Scandrick again looked for Brooke, stating that he was "going to kill her." Based on the evidence, a jury could have reasonably inferred that Scandrick was trying to intimidate Brooke due to her charges against him.
 {¶ 33} The second assignment of error is overruled.
 {¶ 34} The judgments of the trial court will be affirmed. *Page 12 
BROGAN, J. and FAIN, J., concur. *Page 1